```
                IN THE UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF FLORIDA
                     JACKSONVILLE DIVISION

UNITED STATES OF AMERICA,      Jacksonville, Florida

        Plaintiff,             Case No. 3:08-cr-315-J-32MCR

vs.                            January 28, 2009

CHASE E. KEEFOVER,             11:17 a.m.

        Defendant.            Courtroom No. 10D
_____
```

                          SENTENCING HEARING
            BEFORE THE HONORABLE TIMOTHY J. CORRIGAN
                  UNITED STATES DISTRICT JUDGE


GOVERNMENT COUNSEL:

        **JONATHAN CROSS McKAY, ESQ.**
        United States Attorney's Office
        300 North Hogan Street, Suite 700
        Jacksonville, Florida  32202

DEFENSE COUNSEL:

        **A. RUSSELL SMITH, ESQ.**
        A. Russell Smith, PA
        519 Newnan Street
        Jacksonville, Florida 32202


COURT REPORTER:

        Shannon M. Bishop, RMR, CRR
        221 North Hogan Street, #150
        Jacksonville, Florida 32202
        Telephone:  (904)549-1307  Fax:  (904)301-6844
        dsmabishop@yahoo.com

(Proceedings reported by microprocessor stenography;
transcript produced by computer.)

1                    P R O C E E D I N G S

2    January 28, 2009                              11:17 a.m.

3                         - - -

4              COURT SECURITY OFFICER:  All rise.  This Honorable

5    Court is now in session.  Please be seated.

6              THE COURT:  I apologize for running late.  This is

7    *United States versus Chase Keefover*, 3:08-cr-315.  Mr. McKay

8    represents the government.  Mr. Smith represents

9    Mr. Keefover.

10             Let me make sure I'm saying the name correctly.

11             How do you pronounce it, sir?

12             THE DEFENDANT:  Keefover.

13             THE COURT:  Keefover.  Okay.

14             Okay.  We're here today for sentencing in this

15   case.  I have read the PSR.  I've read Mr. Smith's

16   sentencing memorandum.  And I've read a report from

17   Mr. Sheridan regarding Mr. Keefover's compliance with

18   conditions of pretrial release.

19             I've also familiarized myself with some past

20   sentencings I've had in this area, just so -- I'm trying

21   to -- trying to make sure I'm, at least in some measure,

22   not -- not according unwarranted sentencing disparities in

23   these cases.

24             All of them, obviously, are unique.  But they have

25   some common features to them.  And I wanted to make sure --

1  I'm trying to be as consistent as I can, while still taking

2  into account individual circumstances.  So let me start --

3  there are objections to the PSR that we need to work

4  through.

5          The issue of the sex offender registration, I want

6  to save that for when we get to that part of the

7  pronouncement.  And we can have any discussions we need to

8  have.  So I'm not going to worry about that right now.

9          The two that I thought that might need discussion

10  were the -- in paragraph 26 there's the two-level increase

11  for ten images or more.  And then in paragraph 24 there's a

12  two-level increase because the images depicted a minor who

13  had not yet reached the age of 12 years.

14          Mr. McKay, I was told by the probation officer

15  that the government is not going to try to prove the ten

16  images or more.  Is that correct?

17          MR. MCKAY:  Yes, Your Honor.  The reports that

18  probation reviewed and the evidence itself on paper

19  certainly supported the conclusion over ten.

20          But after reviewing the images themselves, we

21  believe one of them did not qualify and would not have been

22  prosecuted.  So, therefore, we concur it's nine or less.

23          THE COURT:  Okay.  Then I'll go ahead and make

24  that adjustment, which is a two-level adjustment.  So that,

25  right now, puts us at a 19/I, which is 30 to 37 advisory

 1  guidelines.

 2          Now, is the government maintaining the probation

 3  officer's position that some of the images do involve minors

 4  who are not yet 12 years old?

 5          MR. MCKAY:  Yes, Your Honor.  After reviewing the

 6  objections, I spoke to Mr. Smith.  And I believe the --

 7  they're going to withdraw that objection, after going over

 8  the evidence with us, is my understanding.

 9          THE COURT:  Mr. Smith, is that correct?

10          MR. SMITH:  Good morning, Your Honor.

11          THE COURT:  Good morning.

12          MR. SMITH:  Yes, it is.  As we stated in our

13  objection, the -- and now I'm trying to find it -- that we

14  would withdraw the objection to that two-level increase if

15  identifiable victims were -- who were clearly underage were

16  involved.

17          Mr. McKay and I have spoken.  And he has provided

18  me with sufficient information to determine that that is the

19  case.

20          So they're not using the Tanner Scale or

21  estimating.  There's actual identifiable victims.  So we

22  would withdraw that objection.

23          THE COURT:  All right, sir.

24          So that means that Mr. Keefover is withdrawing the

25  objection to paragraph 24 of the PSR.  And I will,

1 therefore, sustain that finding.  And that means that

2 there -- paragraph 24 is correctly scored, which is a

3 two-level increase.

4          So we have -- and, Mr. Smith, are there any other

5 objections to the PSR scoring?

6          MR. SMITH:  Not to the scoring, Your Honor.

7 There's just the SORNA issue.

8          THE COURT:  Okay.  And we'll deal with that at the

9 end.

10         All right.  And, Mr. McKay, does the government

11 have any objections to the PSR?

12         MR. MCKAY:  No, Your Honor.

13         THE COURT:  Okay.  All right.  Then, as amended,

14 which is to remove the -- the two-level enhancement under

15 paragraph 26 will now -- that will now be removed.  And,

16 therefore, that's -- that's a zero.

17         When you carry that through, the base offense

18 level becomes 19.  And the criminal history category is I.

19 As I indicated earlier, that yields 30 to 37 months on an

20 advisory guideline basis and five years -- still the minimum

21 mandatory on supervised release, up to life.

22         Mr. Coxwell, is everything else the same, the fine

23 range and the special assessment?

24         PROBATION OFFICER:  The special assessment is,

25 Your Honor.  The fine range is now 6,000 to 60,000.

1          THE COURT:  So the fine range will be adjusted to

2    6,000 to 60,000.  And without further objection those will

3    be the guidelines which will advise the court in this

4    sentencing.

5          Now, Mr. Smith, I did have the benefit of your

6    sentencing memorandum, but I'd be happy to hear from you and

7    from Mr. Keefover, and however you wish to proceed, in terms

8    of the court's consideration of the 3553(a) factors in this

9    case.

10         MR. SMITH:  Thank you, Your Honor.

11         Your Honor, I will try not to cover the same

12   ground that I covered in the sentencing memorandum regarding

13   Mr. Keefover's background, his conduct, you know, since

14   being arrested, and -- and even before all of this came up.

15         And I will only mention that, as I said in the

16   sentencing memorandum, he was a law-abiding citizen before

17   this occurred and has been since.  That is borne out by

18   Mr. Sheridan's report.

19         There is, in my opinion, Your Honor, very little

20   risk that he is likely to become a recidivist, and I would

21   submit very little danger to the community.

22         Your Honor, drawing the court's attention to one

23   phrase I used in the -- at page six of my sentencing

24   memorandum, we are asking that Mr. Keefover be punished for

25   the youthful indiscretion he committed, not the assumptions

1  inherent in the sentencing guidelines applicable to the

2  offense charged.  And that's what we're asking the court to

3  do today.

4           Your Honor, we understand that Internet

5  transmission of child pornography is a very serious offense.

6  But there are those cases which do not fit within the

7  mainstream of cases involving Internet downloading of child

8  pornography.  And we would submit that this is one of those.

9           This is a case where Mr. Keefover, while a high

10 school student, downloaded batch files from KAZAA with names

11 like Lolieta, hot young babes, and similar labels that

12 contained these photographs.

13          He told investigators when he was first confronted

14 with the information on his computer that he never

15 intentionally saved the photographs, that KAZAA did that

16 automatically on his computer.

17          And if the court is familiar with these

18 file-sharing systems -- I won't go into a lot of detail.

19 But I think it's important for the court to understand how

20 these work, in order to put context on this.

21          KAZAA, WinMX, Napster, Lime Wire -- Napster not so

22 much anymore, since they've been purchased and are now

23 proprietary.

24          They're actually a lawful, file-sharing

25 service -- are of a genre of Internet sites where they link

1  through the Internet -- through high-speed Internet

2  connections with millions of computers around the world,

3  home computers like yours or like Mr. Keefover's.

4            They use those home computers to store images.

5  And they put a description on the Web site of what the

6  images purport to be.  And they store still images, which

7  are JPEGS.  They store short videos which are WMV files.

8  And they store a tremendous amount of music in the form of

9  MP3 files.

10            These file-sharing services are extremely popular

11  with teenagers because they can download things like videos

12  and music, et cetera, without paying for the content.

13            And what happens is when you download the software

14  so that you can download these pictures, it sets up a

15  file -- an inaccessible file on your computer where these

16  images are then stored.

17            And you can read them, but that's -- it sits in

18  the background on your computer.  And if somebody else,

19  anywhere else in the world, requests that same file from

20  KAZAA, without anything you do or without you even knowing

21  it, KAZAA may access your computer to retrieve that file.

22            That's how the files were saved on Mr. Keefover's

23  computer, automatically by KAZAA.  And that's what he told

24  investigators.

25            It's one of the pernicious effects of this

1  file-sharing software, which, as the father of two

2  teenagers, I've had to deal with.  That's why I educated

3  myself.  And it's -- and, fortunately, in my case it was

4  music.

5          But, in any case, Your Honor, it also leaves your

6  computer wide open to viruses and other, you know, things,

7  like Trojan horses and things like that.

8          The other thing about these files is they download

9  in batches.  So you may download a folder called hot young

10  babes and there may be 50 images in that folder, many of

11  which are appropriately aged individuals and many of which

12  may not be.

13          In addition, Your Honor, sometimes these files are

14  mislabeled.  And while I can't think of a particular

15  instance from KAZAA or any of these others, I can draw an

16  analogy.

17          If you visit You Tube, Your Honor, there is a

18  video by Rick Astley of a disco song called *Together*

19  *Forever*.

20          And some prankster has uploaded that to You Tube

21  under President Obama's inaugural speech, John McCain's

22  concession speech, President Bush addresses the troops.

23          And you will go in to You Tube thinking -- David

24  Letterman's interview of John McCain, those kind of things,

25  and you'll go -- click on it to see that and it will come up

1   with this disco video.

2           That's the same kind of thing that can happen in

3   these file-sharing servers.  You can think you're

4   downloading one thing and download something completely

5   different.  They're bad news.

6           But they prey on teenagers who don't have the

7   money to go to iTunes or whatever to download these -- these

8   music videos or the songs.

9           That's how these ended up on Mr. Keefover's

10  computer.  More importantly, there's no evidence that after

11  he left high school Mr. Keefover ever downloaded any

12  additional images, that he ever transmitted any of these

13  images, or shared, displayed, or otherwise in any way used

14  the images on the file.

15          In fact, Mr. Keefover will tell you that he

16  didn't, until he was confronted with them, particularly

17  remember that the images were on the file -- on the

18  computer.

19          What happened in this case after Mr. Keefover

20  joined the Navy, he asked his parents to send him his

21  computer to use in his everyday life.

22          And while he was on leave, he had left his

23  computer in an area of his ship -- I believe it was the

24  Halyburton -- where there was some repair work going on.

25          People found his computer and looked at the

1  computer, found the images, turned them over to the Naval

2  Investigative Service.  And that's how Mr. Keefover was

3  discovered.

4          He had, up until that point, a sterling naval

5  career without any problems.  He's a Category I on the

6  guidelines.  So the nature of this offense and the way that

7  the files came to be downloaded on his computer all indicate

8  that there is very little likelihood that he will reoffend

9  and, most importantly, virtually no danger to the community.

10          And we would ask the court to consider that in

11  fashioning the appropriate sentence.  He's a good kid who

12  made a silly mistake back when he was in high school, and is

13  now paying for it, because he didn't realize the seriousness

14  of it at the time.

15          We're asking the court to find that Section 5C1.1

16  of the guidelines is advisory only and not mandatory, and,

17  therefore, the -- to impose, after consideration of the 3553

18  factors, a probationary sentence or a sentence of time

19  served followed by a period of supervised release, which is

20  mandatory in this case, Your Honor.

21          Or, in the alternative, if the court finds that

22  there is a -- that 5C1.1 must apply, to find a

23  seven-or-more-level downward departure for heartland

24  reasons, to bring the guideline sentence within Zone C, so

25  the court could fashion a sentence which would involve home

1  detention that would allow him to live with his parents,

2  work every day, continue his relationship with his fiancée,

3  and otherwise try and repair his life and regain the path he

4  was previously on, which was toward a lawful, productive

5  life as a citizen, without unduly punishing him for

6  something which clearly, while serious -- again, the

7  guidelines just seem to assume or presume that these types

8  of offenses 100 percent of the time occur as a result of

9  some kind of predatory interest.  And I just don't think

10 that's here in this case, Your Honor.

11         And that's why we would submit that a sentence

12 either pursuant to a heartland departure or pursuant to the

13 3553 factors of probation or a short period of home

14 confinement and followed by the five years of supervised

15 release would be appropriate.

16         Your Honor, Mr. Keefover's mother and fiancée have

17 traveled with him to be here today.  I would ask them to

18 stand so the court can acknowledge them.

19         I'm not asking them to speak.  They have written

20 letters to the court, which I would ask the court to review,

21 together with his father and his sister, who is a first

22 grade teacher.

23         Chase is a decent guy who made a serious mistake.

24 But he does not pose a risk to anybody else.  And I would

25 ask the court to keep that in mind when it considers the

1  appropriate sentence.

2          Mr. Keefover would also like to address the court.

3          THE COURT:  Let me acknowledge the family members.

4          I appreciate you-all being here under difficult

5  circumstances.  And I will read what you've written to me.

6  And I do appreciate it.  Thank you.

7          Let me -- before I hear from Mr. Keefover, let me

8  go ahead and read the materials that you just provided to

9  me.

10         All right.  I have reviewed the letters from

11 Mr. Keefover's sister, mother, father, and fiancée.  And I

12 will make them Composite Exhibit 1 to the sentencing

13 hearing.

14         (Court's Composite Exhibit No. 1 was marked for

15 identification.)

16         THE COURT:  All right, sir.

17         THE DEFENDANT:  Good morning, Your Honor.

18         Okay.  I understand the seriousness of this case.

19 And I don't try to downplay it at all.  You know, this -- I

20 made a lot of mistakes as a teenager.  This being one of the

21 biggest ones, obviously.

22         And, you know, this isn't something that, you

23 know, I did on a daily basis or anything like that.  I

24 actually had two computers that were confiscated, one that

25 was new that I've had for about a year and a half or so,

1 that I used every day, which it didn't have anything on it

2 whatsoever.

3          The other computer I hadn't used in a long time.

4 It sat in my -- my rack on the ship for a lot of the time.

5 It never got turned on.

6          And, you know, I don't want -- it's a mistake from

7 a teenager.  And I don't want to, you know, be judged just

8 because of something I did when I was younger.

9          You know, since all this has happened, I've had my

10 family behind me, my fiancée behind me, all the way.  You

11 know, and before this happened, I was in the Navy.  I was

12 talking with a police officer from back home about becoming

13 a police officer after I finished my naval term.

14          Since then -- I can't do that anymore, obviously.

15 I've been discharged from the Navy.  But -- it's bad.  But

16 it's not something that has ruined my life.  I still have my

17 family behind me and my fiancée behind me.

18          I am sorry for what's happened.  And if I can

19 change it, I would.  But I can't.  You know, I have -- you

20 know, I grew up in a family involved, you know.  And if

21 something like this was to happen to one of them, I'd be

22 upset.  I understand the seriousness of it.  And I'm not a

23 bad person.  I just made a severely dumb mistake when I was

24 younger.

25          MR. SMITH:  Thank you, Your Honor.

 1              THE DEFENDANT:  Thank you for your time, Your

 2   Honor.

 3              THE COURT:  Thank you, sir.

 4              Does that conclude your presentation, Mr. Smith?

 5              MR. SMITH:  Yes, Your Honor.

 6              THE COURT:  Let me hear from the government,

 7   please.

 8              MR. MCKAY:  Your Honor, the government is asking

 9   for a sentence at the low end of the guidelines, 30 months.

10   I think the United States would be remiss if we didn't

11   acknowledge that this was a low number of images, that

12   Mr. Keefover was, in fact, a teenager when he searched for

13   these, and that after June there's no evidence that he did

14   actually search for any more images, or have anything else

15   on the secondary computer, which he mentioned.

16              Unfortunately, though, that's not the end of the

17   story.  And there's a reason that 30 months here is

18   applicable and should be the sentence imposed, is that when

19   Mr. Keefover searched for these files in the term KAZAA that

20   Mr. Smith was describing, he searched for terms such as

21   preteen Lolieta, teen, and young teen.

22              And the images that responded to his search terms

23   were kinder, 16 brother and sister, 10 and 14 sex porn,

24   preteen, kiddie underage, and 13 year old spreads for you,

25   among others.

1          So it was clear when he received his hits that

2    they were, in fact -- or at least he was on notice that the

3    images were contraband.

4          Additionally, outside of the share folders, the

5    facts of the case support that when the images were first

6    discovered they were within his My Documents file, and that

7    within that My Documents file, not the shared KAZAA file,

8    there were two folders, one titled 13-year-old girl and

9    19-year-old girl.

10         So he was aware that he had these images and took

11   them with him, and certainly didn't take the steps to delete

12   them.

13         And while he has some mitigating and even

14   extenuating -- for being a teenager searching for these,

15   there's no less of an impact on the victims themselves.

16         I think the crime here is axiomatic -- it speaks

17   for itself -- that these children were prepubescent.  At

18   least some of them suffered severe, sometimes physical --

19   and I think reasonably we can infer that there will be

20   emotional distress for them forever.

21         Because Mr. Keefover only looked for nine images

22   doesn't have any less of an impact on the victims in these

23   cases.

24         In addition, Congress has found that this is a

25   market and that every person that searches for these creates

1   and synergizes this market.  And anything outside of 30

2   months would really deteriorate from the general deterrence

3   that we're trying to seek here.

4          And in Section 3552(a)(4), that's a significant

5   factor that we would ask the court to consider here, is that

6   we just simply can't have people searching for this stuff.

7   They must be accountable.  We must set a general deterrence.

8          Additionally, Mr. Keefover was serving in the

9   Navy.  And he brought these images into a closed

10  environment, a small environment with young men and women,

11  similarly situated to him, 18, away from home for the first

12  time, and they were exposed to that, as evidenced by the way

13  that these images were, in fact, found.

14         So it wasn't just isolated to Mr. Keefover.  They

15  were discovered by another Navy sailer on the ship and

16  brought them into these very small spaces.

17         THE COURT:  I wasn't clear -- I understand what

18  you're saying.  It wasn't, though, as if Mr. Keefover

19  intentionally exposed them to it, right?  They had to

20  actually go on to somebody else's computer and find it,

21  right?

22         MR. MCKAY:  Well, it was his computer, Your Honor.

23  And when it was discovered --

24         THE COURT:  What I meant -- somebody else's, not

25  their own, right?

1          MR. MCKAY:  Yeah.  It was left out in an open area

2     as Mr. Keefover was transitioning from there to the barracks

3     room.

4          And another semantic part of that, sir, is that he

5     denied ownership of the computer when he was confronted, Is

6     this your computer, no, which lends us -- lends us to

7     believe that he certainly had knowledge it was on there when

8     he denied ownership of it.

9          But anything departing below 30 months, Your

10    Honor, would be inappropriate and send the wrong message to

11    other people searching.

12         And the United States would ask for that, followed

13    by a period of ten years of supervised release, to ensure

14    Mr. Keefover has the right start when he does get out of

15    confinement.

16         Additionally, if I may take it up now, there's a

17    forfeiture provision.  We've supplied the court with a

18    courtesy copy of the preliminary order of forfeiture and

19    would ask that that forfeiture be listed in the judgment and

20    commitment order.

21         THE COURT:  Sure.  Maybe that's not controversial.

22         Mr. Smith, I assume it's part of the plea

23    agreement.  I can't recall it.  I read the plea agreement.

24    But I can't recall reading it specifically right now.

25         But is there any objection to the preliminary

1  order of forfeiture which requires Mr. Keefover to give up

2  his interest in the Dell computer?

3         MR. SMITH:  No, Your Honor.  And I thought we had

4  executed a consent to forfeiture for Ms. Glober.  But if we

5  haven't, I'm happy to do it.

6         THE COURT:  Okay.  Well, I'm being presented with

7  a preliminary order forfeiting the materials.  And I'll just

8  go ahead and sign that.

9         It forfeits -- it gives Mr. -- it gives up

10 Mr. Keefover's interest in the Dell computer.  And I'll

11 enter that at this time.

12        MR. MCKAY:  Thank you, Your Honor.

13        Do you want me to take up SORNA initially, since

14 it was addressed in the defense memorandum or...

15        THE COURT:  Well, that's a condition of release,

16 right -- of supervised release, correct?

17        MR. MCKAY:  Yes, sir.

18        THE COURT:  Okay.  Let's wait until we get to

19 that.  Let me figure out what the sentence is going to be

20 first.

21        Does the government have any other -- I mean, does

22 that conclude the government's presentation?

23        MR. MCKAY:  Oh, I'm sorry, Your Honor.

24        THE COURT:  Does that conclude the government's

25 presentation?

 1          MR. MCKAY:  Yes, Your Honor.

 2          THE COURT:  Okay.  Mr. Smith, did you have any

 3   concluding remarks?  Or are you -- have you said everything

 4   that you needed to say?

 5          MR. SMITH:  Your Honor, I just wanted to address

 6   one point made by Mr. McKay, without belaboring it.  I

 7   checked with Mr. Keefover.  He tells me that what actually

 8   occurred was that the shipmate who hacked into his computer

 9   and found the images was initially the one that asked him,

10   Is this your computer?

11          He told that person no because he had promised to

12   give the computer to yet another shipmate.  But when law

13   enforcement confronted him, he immediately admitted

14   ownership and fessed up to what was on the computer.  It was

15   not an attempt to minimize his involvement or to avoid

16   responsibility.

17          THE COURT:  The one -- and this -- I don't know if

18   this is going to make a difference or not.  But the one

19   factual disconnect that I couldn't quite -- and Mr. McKay

20   didn't really reference it, so maybe it's not a -- an issue.

21          But I noticed that in the factual basis of the

22   plea agreement it says -- let me get the exact words,

23   that -- that later -- down at the bottom of page one of the

24   factual basis, And later brought the computer with the child

25   pornography on board the U.S.S. Halyburton, the ship to

1  which he was assigned.

2          And then it says in the next paragraph, Although

3  he viewed the images of child pornography while assigned to

4  the U.S.S. Halyburton he never downloaded additional images.

5  And it goes on from the other things that you were talking

6  about.

7          Now, your sentencing memorandum led me to

8  believe -- it says he has not viewed any of the photos

9  referenced in the indictment since downloading them and he

10  never downloaded any additional images and so forth.  Those

11  two things aren't exactly the same.  And I'm trying to

12  figure out how to understand.

13          MR. SMITH:  Well, Your Honor, I think the

14  explanation is simple.  I believe that the reference to him

15  viewing them while on the Halyburton comes from an

16  investigative report that when they did a forensic analysis

17  of the hard drive it showed that the picture files had been

18  accessed while on board the Halyburton.

19          I thought we had sufficiently investigated that

20  and determined that the viewing actually took place by the

21  shipmates who were looking at the computer who turned him

22  in, not by him.  But, frankly, that got by me at the change

23  of plea hearing, Your Honor.

24          THE COURT:  Okay.  Mr. McKay, I don't -- I mean,

25  again, maybe -- you know, maybe that's not of significance,

```
 1   although one might think it might be.

 2               MR. MCKAY:  Well, sir --

 3               THE COURT:  What's the government's position?

 4               MR. MCKAY:  Mr. Keefover gave a statement to the

 5   NCIS agent, indicated that, The last time I used the

 6   computer was about one year ago when I first got to the

 7   ship.  At the time the computer did not have Internet

 8   access.  But I did view all the images and files, to include

 9   the 15 to 20 pornographic images.

10               THE COURT:  Okay.

11               MR. MCKAY:  I believe that's in the factual basis.

12               THE COURT:  Okay.

13               (Counsel confer.)

14               MR. SMITH:  May it please the court?

15               THE COURT:  Yes, sir.

16               MR. SMITH:  And I'm willing to put Mr. Keefover

17   under oath regarding that portion of the statement, if the

18   courts wishes.

19               According to Mr. Keefover, what he told the

20   investigator was.  He accessed every program on the file,

21   but he didn't look at everything.

22               He accessed it by running a virus scan program,

23   which essentially went through every file looking for

24   viruses, when he first used the computer.

25               It wasn't a matter of actually sitting there and
```

1    looking at every image.  It was a matter of running software

2    to check for viruses.

3              THE COURT:  All right.  Thank you.

4              Any legal bar to sentence, Mr. McKay?

5         MR. MCKAY:  No, Your Honor.

6         THE COURT:  Mr. Smith?

7         MR. SMITH:  No, Your Honor.

8              THE COURT:  All right.  Well, let me think about

9    this a minute.

10             I'm going to take a brief recess.

11             COURT SECURITY OFFICER:  All rise.

12             (Recess, 11:54 a.m. to 12:02 p.m.)

13             COURT SECURITY OFFICER:  All rise.  This Honorable

14   Court is now in session.  Please be seated.

15             THE COURT:  Well, first of all, let me -- let me

16   try to talk for a minute about what I have to -- the things

17   I have to consider, and then to actually articulate my

18   consideration of those matters.  And then, of course, I'll

19   call you up and pronounce in a moment.

20             Mr. Smith suggests that I ought to look at this

21   case under a traditional guidelines analysis and do what's

22   called a heartland departure.

23             And that is a departure that is available to the

24   court if this -- if the case is outside of the norm of

25   cases, the court can depart on that basis.

1          I don't think that's a bad suggestion.  I'll be

2   honest with you, though.  I have not gotten those arguments

3   too often, nor had occasion to consider them too often since

4   the *Booker* case.

5          And I think that's probably because the types of

6   things that the court is required to consider under a

7   3553(a) analysis may overlap, to a large extent, the

8   considerations the court would give in a heartland

9   departure, and that

10  the -- I, frankly, think that the 3553(a) statute gives the

11  court more guidance and gives the court a way to think more

12  clearly than perhaps the heartland departure does.

13         And so while I recognize the availability --

14  potential availability of a heartland departure, I'm not

15  going to proceed under that route.  And so let me -- let me

16  remind everybody where we are and why we are where we are.

17         Mr. Keefover is -- the advisory sentence that the

18  sentencing commission, in promulgating the sentencing

19  guidelines, has recommended for this case would be a term of

20  imprisonment of 30 months to 37 months, so three years and

21  one month, up to three years and ten months, for this crime.

22  That's the recommended advised.

23         And that's based upon a number of factors.  Some

24  of them empirically based.  That is, the number of images.

25  That is, the more images you have, the more serious it is.

1          Some of it can be based on the -- on how graphic

2   the images are.  And Mr. Keefover's crime did not require

3   application of the aggravation that occurs when the images

4   are even more graphic or violent than the images that we're

5   talking about in this case.

6          That doesn't make this case less serious, in terms

7   of the bottom-line crime, but it does -- it does make it --

8   it does say that the guidelines do treat certain types of

9   child pornography as even more serious than other types of

10  child pornography, all while being treated very seriously.

11         But Mr. Keefover does get the base offense level

12  of 18, which is a reflection of the sentencing commission's

13  view that any type of possession of child pornography at all

14  is going to be viewed very seriously, because that's a high

15  base offense level.

16         They also increase it any time you use a computer,

17  which is practically every single time.  It's one of the

18  quibbles I have with the advisory guidelines.

19         It seems like you're double counting in a way,

20  because I -- at least I have not -- and I'm starting to have

21  more of these cases, unfortunately.  And I've not seen one

22  that didn't involve the computer.  But it is an enhancement.

23  And then Mr. Keefover gets credit for pleading guilty and

24  accepting responsibility.

25         The government, probably to its credit, has not

1   pushed the issue of the number of images.  And that might

2   have been a battle that we could have had and we didn't have

3   to.

4           And I think that's -- I think that's the correct

5   way for the government to view it.  But the government could

6   have pushed it and I would have had to make a decision.  So

7   I appreciate that.

8           Anyway, but all of this is -- for a first-time

9   offender, all of this -- it's a relatively -- even though

10  it's not as high of a sentence as it could have been -- I

11  had a person in here two months ago who was a first-time

12  offender and had done some of the same things, but there

13  were more images involved.  They were more graphic, more

14  violent.  And that guideline was 57 to 71 months.

15          And so -- so even though these guidelines are

16  difficult for Mr. Keefover, they're not as difficult as they

17  might have been in other circumstances, even for a

18  first-time offender.

19          But the fact that these guidelines treat -- are as

20  high as they are for a first-time offender is a recognition,

21  as Mr. McKay indicated, of the Congressionally found

22  decision that -- and policy that this is a very serious

23  crime, that people -- even people who just view it are

24  creating the market for it, or helping to create the market

25  for it, it's degrading to the victims, and all of the things

 1  that go into the discussion about child pornography and its

 2  proliferation.

 3          And so the fact that these guidelines are as high

 4  as they are, even for somebody in Mr. Keefover's position,

 5  is a recognition that I -- of the law and how -- and how

 6  both Congress and the sentencing commission -- how seriously

 7  that this crime is viewed.  And it's not something I can

 8  cast aside lightly.  And so I do have to take that into

 9  account.

10          Having said that, I also do not accept the view

11  which says that all of these crimes are the same and that

12  they all have to result in long prison sentences.

13          There are some cases that -- there are gradations

14  of these crimes.  And I've had some that were so serious

15  that the sentences were 20 years.

16          And these were people who were either predators or

17  that they -- I had one who had hundreds of thousands of

18  images.  And this was his life's work, was collecting and

19  disseminating these child pornography.

20          And those people, deservedly so, get far, far

21  greater treatment by the court.  I think I had two 20-year

22  sentences in a row in cases that were highly aggravated.

23          Mr. Keefover's case, while serious, is on the

24  opposite end of that spectrum, in my view.  He committed a

25  crime.  It's a serious crime.  He's going to have to face

1  the consequences.

2           And, indeed, he has already faced significant

3  consequences in the loss of his naval career, the loss of

4  the ability to be a law enforcement officer, a five -- a

5  minimum five-year supervised release, which I have no

6  control over.

7           And so he's already -- and he's going to be a

8  convicted felon.  And he's going to maybe have to register

9  for -- in certain states and be subjected to certain

10  restrictions on his -- on his liberty that others would not

11  have.

12           And so I don't think any of that should be

13  overlooked as being a serious consequence for something that

14  he -- that he did when he was 18 years old.

15           And so when -- the question in my mind is, beyond

16  that, what's the appropriate sentence that will be in the

17  words of the law sufficient but not greater than necessary

18  to comply with the statutory purposes of sentence?

19           And when I look at the factors, the nature and

20  circumstance of the offense, again, I've already discussed

21  how seriously child pornography is taken by the law.

22           But in the gradation of offenses, I think this is

23  on the less serious side of child pornography than certainly

24  on the more serious side, which I've already discussed.

25           The history and characteristics of this defendant

1 are that other than this act, this criminal act for which he

2 is before the court, he seems to have virtually a flawless

3 record.

4          He was -- he's got good family.  He's got -- he

5 was in the Navy.  He was apparently well-respected and is

6 obviously well-loved by his family and friends, who all

7 think the world of him.

8          And so -- and I have to say, the government has

9 made no effort to demonstrate to me that they believe that

10 Mr. Keefover is any type of predator or pedophile or

11 something that would require the court to look at it in a

12 different way.

13          Now, of course, we don't know -- none of us knows

14 the answers to that.  We certainly have no reason to think

15 so at the moment.

16          But Mr. Keefover, under any circumstances, will be

17 under the court's supervised release for a period of five

18 years, and will also be subject to counseling, that will

19 detect, hopefully, if there are more serious problems than

20 we're aware of at the moment.  And so that gives me some

21 comfort.

22          But this is not a case in which the government has

23 tried to indicate to me that this is just the tip of the

24 iceberg or this is just a part of a pattern of conduct that

25 they would have expected Mr. Keefover to continue into the

1  future and perhaps turn more serious.  And there's no

2  evidence before me that would justify such a belief.

3        I do question sometimes why in these cases we're

4  not getting either from the government or from the defense

5  some type of presentence psychosexual evaluation of these

6  defendants, so that the court would have at least one

7  professional's opinion as to the risk of future problems and

8  what the current status of the person is.  But we don't seem

9  to be getting those from either side.

10        And so the court just has to assume that unless

11  the government comes forward and tries to prove it, or the

12  defense tries to prove the opposite, the court is left with

13  the assumption -- based on the nature and circumstance of

14  the offense and how it played out, the court is left to, in

15  essence, just take an educated view or guess about the

16  person and assume either that they are going to head in the

17  wrong direction or they're not.

18        And in this case, based on all the facts and

19  circumstances, I have no reason to think as I sit here that

20  Mr. Keefover is a future threat of being a predator or

21  pedophile or to threaten children in any -- in any

22  significant way in the future.

23        Indeed, because he'll be on supervised release,

24  and, hopefully, chastened by this event, I would think he

25  might be a person who would pose little or no risk in the

1 future for recidivism or for more serious criminal conduct.

2          Nevertheless, I do need to reflect the seriousness

3 of the offense.  I need to promote respect for law.  And I

4 need to provide just punishment.

5          And I -- as I said, Congress and the sentencing

6 commission both have made it clear that punishment is an

7 issue in this case.

8          Deterrence is also an issue.  And deterrence,

9 simply stated, is to stop people from doing it in the

10 future.  And we -- we want to stop, of course, Mr. Keefover

11 from ever doing anything like this again.

12          And I certainly would expect that he would not.

13 But we also need to send a message, as Mr. McKay said, that

14 this type of conduct is taken seriously by the courts.  And

15 so that is something I have to take into account.

16          I need to protect the public from further crimes

17 of this defendant.  I think I've already addressed that.

18 And I need to provide Mr. Keefover with whatever counseling

19 or other intervention is appropriate, given the

20 circumstances.  I need to look at the kinds of sentences

21 available.  And I need to avoid unwarranted sentencing

22 disparity.

23          So with all that said, I have -- I have not -- you

24 know, I maybe have had now -- in the last year or so, I may

25 have had ten of these cases.

1          Some of them very, very aggravated.  Some of them

2    kind of in the middle.  And some, recently, which are on the

3    -- on the much lesser end of the seriousness spectrum.

4          And I have to say that Mr. Keefover's case is

5    the -- is the case that I view as being on the mostly

6    serious -- or the least serious that I've had so far.

7          Again, it doesn't mean it's not serious, but I --

8    my view is that the guidelines in this case overstate the

9    punishment which is appropriate in this case.

10          Having said that, I cannot accede to Mr. Smith's

11    request that I just do a straight type of probationary

12    sentence.

13          I just think because of the nature of the crime

14    and because of the factors of just punishment and deterrence

15    that that's just simply not an option that I can exercise in

16    this case.

17          There may be a case where that's appropriate.  And

18    this case comes close to it.  But I just don't think that I

19    can do that in this case.  And so that's my analysis under

20    3553(a).

21          And, Mr. Smith and Mr. Keefover, if you'll come

22    forward, please, sir.

23          Mr. Keefover, on October 22nd, 2008, you entered a

24    plea of guilty to Count One of the indictment, charging

25    possession of child pornography in the special maritime and

1  territorial jurisdiction of this court, and of the United

2  States, in violation of 18, United States Code, Section

3  2252(a)(4)(A).  The court has accepted your guilty plea and

4  adjudged you guilty of the crime.

5           Let me -- I apologize.  Let me say one other thing

6  that is on my mind.  One of the reasons I don't think I can

7  consider a probationary sentence in this case is that

8  because of the -- of the Navy overlay here, that

9  Mr. Keefover, while on naval -- while a naval -- while in

10  the Navy and on active duty, brought this material on board

11  a United States naval vessel.

12           And whether he did so inadvertently or not, it's

13  hard for me to tell.  But it is a fact.  And -- and it's

14  just -- that's an overlay that is -- has implications that

15  are -- are something that I do need to take into account,

16  because we have had several cases involving Navy personnel.

17           And so I don't -- I think that's something that

18  I'm having to take into account as I decide a sentence.  And

19  a sentence that I might have even considered Mr. Smith's

20  probationary request, I'm just -- I'm just not able to do it

21  in this case.

22           The court has already advised you-all of the

23  advisory guidelines.  The court having asked Mr. Keefover

24  why judgment should not now be pronounced and no cause to

25  the contrary appearing, and the parties having made

1  statements on their behalves -- I apologize.  I need to say

2  one other thing.

3          The government always talks to me about the

4  victims in these crimes.  And I appreciate them doing so, to

5  remind everybody that this is not a victimless crime, that

6  these are real human beings that have been degraded by these

7  images.

8          And even though I don't have any of those actual

9  persons available to me, I've read the letters before.  I've

10  read how this affects people.  And I do not want by any

11  sentence I ever give to forget about the victims and to

12  forget what we're trying to accomplish by eliminating the

13  market for these materials.

14          And so I -- I don't want any sentence I give, no

15  matter what it is, to be -- to be interpreted as me not

16  fully understanding that.

17          Having said all that, I do not think that there

18  is -- that doesn't mean there's not a basis to look at each

19  individual defendant, to look what they did, to look how

20  they did it, and to -- to judge their case, even

21  understanding how it -- it still has the same impact on the

22  victim as a more aggravated case.  So I do make that

23  statement.  And now I am ready to pronounce.

24          I have asked you why judgment should not now be

25  pronounced.  And no cause to the contrary appearing and all

1   parties having been heard, it is the judgment of this court

2   that the defendant, Chase Keefover, is hereby committed to

3   the custody of the Bureau of Prisons for a term of six

4   months.  And there will be a period of supervised release of

5   five years.

6           During that period of supervised release, there

7   will be a six-month period of home detention, so that -- my

8   intent is to give a total incarcerative sentence of 12

9   months, but it will be six months BOP, six months home

10  detention.

11          And I am also -- as I'm thinking through why I'm

12  giving the sentence I'm giving, I also am taking

13  Mr. Keefover's age into account, that he was basically 18

14  years old at the time he committed the offense of

15  downloading the materials and did carry them around with

16  him.  But he's still a young man.  And I do think -- that

17  has some mitigation, as well, in my thinking.

18          There is a five-year period, as I said, of

19  supervised release that's mandatory.  I don't think ten

20  years is required in this case, because I don't think -- I

21  don't think the things we worry about are the -- are

22  required.  I have given up to life before when I thought it

23  was appropriate.

24          But there are going to be strict conditions of the

25  supervised release.  And it's a five-year period, which is a

1  lengthy period.  And I think that the public will be

2  well-protected by these conditions.  You will have to

3  provide the probation officer access to any requested

4  financial information.

5       You'll have to participate in whatever mental

6  health program specializing in sexual offender treatment --

7  or whatever is indicated by the evaluation of the -- of the

8  mental health professionals, you'll have to strictly follow

9  their directions and participate in that programming

10 faithfully and as long as they tell you you have to.  You'll

11 have to pay for it, such as you're able to, on the sliding

12 scale.

13      You will register with the -- whatever state --

14 the state requires of you -- whichever state you're residing

15 in or you visit, whatever the laws are in those states

16 regarding sexual offender registration, you must comply with

17 those laws.

18      And we'll talk about the SORNA in a minute.  The

19 probation officer will have the right to restrict your

20 contact with minors.

21      I don't think that's a real issue here, but I

22 think it's a standard provision.  And I think the probation

23 officer will evaluate how that fits into your life.

24      And if there's family members that are minors and

25 the families are comfortable with it, I'm sure the probation

1  officer will

2  be -- will be appropriate.

3          But there is -- but the probation officer does

4  have the authority under the terms of the supervision to

5  prohibit direct contact with minors and to require you to

6  not be in certain areas that minors might inhabit

7  frequently.

8          You are prohibited from, of course, possessing,

9  subscribing to, or viewing any -- any literature or videos,

10  magazines, depicting children in any type of sexual

11  positions or situations.

12          You'll not be allowed to use the Internet or a

13  computer with Internet access without written approval from

14  probation.

15          The probation officer will be permitted to

16  routinely inspect your computer system and any associated

17  devices for compliance with this.

18          Any employers will have to be aware of these

19  restrictions on your computer access.  And those can be

20  adjusted as appropriate.

21          You are also subject to search of your person,

22  residence, place of business, storage units under your

23  control, computer, vehicles, by probation at any reasonable

24  time for -- based upon a reasonable suspicion of any

25  contraband or evidence of violations of conditions of

 1  release.

 2          I don't see any evidence of drug involvement.  I'm

 3  going to suspend drug testing based on low risk.  You will

 4  have to give a DNA sample.  Based upon your financial

 5  status, I'm waiving fines and costs.  A $100 special

 6  assessment is required.

 7          Forfeiture we've already taken care of.  In your

 8  plea agreement, you waived and gave up the right to appeal

 9  either directly or collaterally the sentence I've just given

10  you unless certain things happen.

11          However, I don't think any of those things has

12  happened.  However, if they have, or if you think you have

13  grounds to appeal, you must do so within ten days from this

14  date.

15          The government can appeal this sentence, as well.

16  And if they do, then you, of course, are allowed to appeal,

17  as well.

18          But failure to appeal within the ten-day period

19  will be another ground for waiver of your appellate rights.

20  You're also advised that you're entitled to the assistance

21  of counsel if you try to take an appeal.  If you're unable

22  to afford a lawyer, one will be provided for you at no cost

23  or charge to you.

24          Mr. McKay -- well, let me go ahead and get the

25  objection.  The court having pronounced sentence, do counsel

 1  for either party wish to object to the court's sentence or

 2  the manner in which the court has pronounced that sentence?

 3          MR. MCKAY:  Yes, Your Honor.  The United States

 4  would object as unreasonable under the guidelines.

 5          THE COURT:  Okay.  Any objection?

 6          MR. SMITH:  No objection from the defense, Your

 7  Honor.

 8          THE COURT:  Okay.  Mr. McKay, you said you wanted

 9  to talk about SORNA.  And Mr. Smith wanted to talk about

10  SORNA.

11          And I have not had an issue with that yet.  So

12  tell me what's on your mind, Mr. McKay.

13          MR. MCKAY:  Your Honor, I -- just in responding to

14  the defendant's memorandum, there's two district courts that

15  essentially have said that SORNA is beyond the reach of

16  Congress' power under the commerce clause and that it's not

17  related to commerce in any way.

18          THE COURT:  And what's -- those are judges in my

19  district, right?

20          MR. MCKAY:  Yes, sir.

21          THE COURT:  Who are they?

22          MR. MCKAY:  Your Honor, one is the Middle District

23  in Orlando.

24          THE COURT:  Is it Judge Presnell?

25          MR. MCKAY:  Yes, Your Honor.  And the other one is

1  Judge Clause, I believe, or --

2          MR. SMITH:  Judge Zloch.

3          MR. MCKAY:  Zloch, in Miami.

4          THE COURT:  Oh, from the Southern District?  Okay.

5          MR. MCKAY:  Yes, sir.  Essentially, the

6  government's first position is that -- in the plea agreement

7  that Mr. Keefover entered into with the United States, is

8  that he agreed he must register under SORNA.  So, therefore,

9  if there is an objection, it seems that he would have

10 reasonably waived it.

11         Obviously, if it's unconstitutional, it would be

12 more difficult to waive.  But the only appellate case law --

13 and this comes out of the Eighth Circuit, where they found

14 that there was, in fact, a nexus.  It's *United States v May*.

15 And they didn't find any problems with the commerce nexus.

16         Additionally, if I could just distinguish this

17 case against the Middle District case out of Orlando, that

18 case involved a defendant who was convicted under South

19 Carolina law of a sex offense and then moved to Florida and

20 failed to register with the state of Florida.

21         This case is different in that Mr. Keefover has

22 been convicted of a federal crime with a direct nexus to

23 commerce, that he's been convicted under 2252 dealing

24 specifically with the interchange of computer files over

25 commerce, interstate, and, even here, through international

1  commerce.

2         THE COURT:  And is the law -- what are you

3  actually asking the court to -- is there something you're

4  asking me to put in the judgment?  Or is the law

5  self-executing?  Or how --

6         MR. MCKAY:  Well, the Attorney General's

7  guidelines under SORNA are that he must register with the

8  state.  Now, you've already indicated he must register under

9  the state of Arkansas, where he's moving to, and the state

10  of Florida.  I think that satisfies it.  But we're asking

11  under SORNA --

12         THE COURT:  Well, what I was intending to say -- I

13  hope I did -- is that if the state law -- if the state in

14  which he resides in or visits -- if that state law requires

15  him, because of his conviction, to take some action, I'm

16  telling him that as part of the terms of his supervision he

17  needs to take that action.

18         MR. MCKAY:  Yes.

19         THE COURT:  So that his failure to do so would not

20  only potentially violate state law, but might violate the

21  terms and conditions of my supervised release.

22         MR. MCKAY:  Yes, Your Honor.

23         THE COURT:  But I don't -- I don't have all 50

24  states' laws memorized.  So I don't know whether this

25  conviction would apply or not.  I assume you think it does.

1          MR. MCKAY:  Yes, sir.  And it would satisfy

2    Title I of the SORNA.  I believe what the defense has raised

3    in the objection, though, is the enforcement of failing to

4    apply with SORNA.  And that's where the unconstitutional

5    issue may come in.

6          It's not under the requirement that you should

7    register.  It's whether the government has the right to

8    prosecute after.  And that's where all that case law is

9    borne out of.

10          THE COURT:  And I guess that would only happen if

11    there was an alleged violation and we were here.  And

12    Mr. Smith could argue it was unconstitutional and --

13          MR. MCKAY:  Certainly, that his failure to

14    register then was not appropriate.

15          THE COURT:  Okay.  Thank you, sir.

16          Mr. Smith, do you wish to be heard?

17          MR. SMITH:  Briefly, Your Honor.  And my

18    understanding of SORNA is imperfect, as well.  But my

19    concern is this.

20          Since the time we entered in the plea agreement,

21    the two courts within the Eleventh Circuit who have

22    evaluated violations of SORNA have both found SORNA to be an

23    unconstitutional exercise of federal jurisdiction in

24    violation of the commerce clause.

25          The Eleventh Circuit has ruled one time regarding

1  SORNA.  Now, it was on a completely different portion of the

2  Sex Offender Registration Notification Act.

3          But the Eleventh Circuit said that portion of

4  SORNA was vague and ambiguous and didn't put defendants on

5  notice of how they violated.

6          I, out of an abundance of caution, wanted to

7  object to imposing the conditions of SORNA on Mr. Keefover

8  in the event that somehow because of the plea agreement we

9  would have later deemed to have waived our right to file

10  motions to dismiss any subsequent prosecution.

11          Because, as I understand SORNA, it's not just that

12  violating SORNA could violate Mr. Keefover's supervised

13  release.  I believe it creates a new substantive offense, as

14  well, if I understand it.  And that's the problem with it.

15          Mr. Keefover will be obligated under Arkansas law

16  to register however Arkansas chooses to enforce

17  registration.

18          He'll be required as a condition of supervised

19  release to comply with Arkansas law, you know, to the extent

20  that this court could punish him for violating supervised

21  release if he didn't.

22          To add yet a third overlay in this case, subject

23  him to future criminal prosecution for a new substantive

24  offense based upon a statute which the growing body of law

25  seems to indicate is vague and may violate the commerce

1   clause seem to me to be overkill.

2          THE COURT:  Well, it seemed to me -- and I'll note

3   your objection.  It's certainly preserved for the record.

4   It would seem to me, though, that argument would be made

5   only if somebody tried to charge Mr. Keefover with a crime

6   under SORNA.

7          Then you would -- that's when you would make your

8   argument.  But I hear you.  I think you've made your record.

9   My only order right now, which the government seems

10  satisfied with, is that -- I am ordering as a condition of

11  Mr. Keefover's supervised release that he comply with state

12  law regarding registration in the state in which he resides

13  and in any states that he visits.

14         Because some states require certain things if you

15  visit for a certain amount of time.  And if I were to find

16  out that he moved back to Florida and failed to comply with

17  state law, and the probation officer says that's a

18  violation, then I think we'd have to have a hearing.  But

19  that's as far as I'm going right now.  Okay?

20         MR. SMITH:  I understand, Your Honor.

21         THE COURT:  Mr. McKay, you rise for what purpose?

22         MR. MCKAY:  Yes, Your Honor.  There's just one

23  more layer.  When anybody is convicted in a state other than

24  they reside, they're also required to register within the

25  state.  So, according to SORNA, he's also required to

 1  register here in Florida before going to Arkansas.

 2          THE COURT:  Okay.  Well, all I'm doing is

 3  requiring him to do what he's supposed to do.  And it seems

 4  to me he's represented by counsel.  And I think the

 5  probation officer and pretrial may have already looked at

 6  some of this.  I don't know.

 7          But I guess the only thing, Mr. Smith, that

 8  probably -- putting it in the conditions, in some ways it --

 9  it requires the defendant, I would take it, to educate

10  themselves on what is required.

11          I mean, because -- but I think that would be true

12  anyway.  I mean, I think -- if you're a person who qualifies

13  under state law, I don't think it's an excuse that you

14  didn't know what the law was or you didn't know it applied

15  to you.

16          MR. SMITH:  I agree.  But, Your Honor, Mr. McKay's

17  statement makes my point.  Mr. Keefover was not convicted in

18  Florida.  He was convicted in federal court in the Middle

19  District of Florida.

20          He's only back here today to face the court and be

21  sentenced.  He's going to be taken into custody and moved to

22  Georgia within an hour or two.  He's not planning to ever

23  come back.

24          The idea that he could be charged with a new

25  substantive offense because, in this brief time that he

1   remained in Florida in federal custody, he failed to go to

2   the local sheriff and register in Florida makes the point

3   that SORNA just doesn't put defendants on notice of what

4   they may -- what conduct may constitute a criminal violation

5   of the act.

6          That having been said, I won't belabor it any

7   longer, Your Honor.

8          THE COURT:  Okay.  Well, I appreciate the

9   discussion, because it -- it's helpful for the record, and,

10  also, helpful for all of our understandings.  But I think

11  I'm going to leave it -- leave it at that.

12         All right.  Anything else from the government?

13  You've objected.  I understand that.  And we've talked about

14  SORNA.  Is there anything else from the government?

15         MR. MCKAY:  No, Your Honor.

16         THE COURT:  Mr. Smith, anything else?

17         MR. SMITH:  Your Honor, I have two requests for

18  Mr. Keefover.

19         THE COURT:  Yeah.

20         MR. SMITH:  I would ask that the court make a

21  specific sentencing recommendation that, if appropriate, he

22  be housed in a camp facility.

23         I am concerned with him.  Because I'm afraid

24  because of the nature of the offense of conviction he might

25  score under BOP guidelines for a more secured facility and

1  that would put him at risk.  I would also ask that the court

2  recommend that he be housed in Arkansas, near his family.

3           THE COURT:  All right.  Now, what is

4  Mr. Keefover's position regarding remand?

5           MR. SMITH:  Your Honor, we would like

6  self-surrender.  We understand, however, it's prohibited by

7  the offense charged.

8           I don't see any way that I can responsibly ask the

9  court to allow him to do that.  As much as I -- I think this

10 would be an appropriate case, I -- I'm bound by the law.

11          THE COURT:  And that's because, Mr. McKay, this is

12 considered under the statute a crime of violence?

13          MR. MCKAY:  Yes, sir.  There's a presumption of

14 violence.

15          THE COURT:  Okay.  Well, if that's so -- and I

16 know we've been -- I know Judge Moore has maybe taken a

17 contrary view on that.

18          But I -- I'm not going to -- I'm not -- I'm not

19 going to litigate that.  And there may be good reasons to be

20 getting on with this anyway.

21          But just for future reference -- Mr. Smith, I know

22 you know this.  But the way I view that law -- because that

23 happens in drug cases, as well, as you know.

24          The way I view that law -- and it's even in my

25 order, I think.  It does require remand.  However, 3145 says

1  that remand can be avoided for exceptional reasons.

2          And so if there were exceptional reasons -- and I

3  don't know that there are any in this case, which I think is

4  probably why you can't argue for it.  You know, I have -- I

5  have on occasion allowed voluntary surrender for exceptional

6  reasons.

7          But I don't -- I'm not really seeing them in this

8  case.  And so, for the record, I guess I do need to -- let

9  me speak to you a moment, Mr. Keefover.

10          I don't know -- I don't know -- really know what

11  you're thinking right now.  But I -- I'm sure the government

12  is not -- they think you should have gone a lot longer than

13  this.

14          THE DEFENDANT:  Yes, Your Honor.

15          THE COURT:  They may not be wrong.  I don't know.

16  All I can do is do the best I can to apply the law to the

17  facts before me.

18          But, obviously, part of my judgment is that -- is

19  that this was something you did, it was really wrong, you

20  shouldn't have done it, you've got to be punished for it,

21  but that you are unlikely to ever do anything like this

22  again, and that I am unlikely ever to hear about anything

23  that you've done again of this type or any other criminal

24  type.  And that -- that's my judgment.  And that's part of

25  the reason that I've given you the sentence that I have.

1          If I thought that there were concerns, or if the

2     government articulated additional concerns, then we might be

3     in a whole different place.  But -- and so -- and you're

4     going to have to carry this around with you for the rest of

5     your life.

6          THE DEFENDANT:  Yes, Your Honor.

7          THE COURT:  And it's not going to be that easy.

8     But you've got to -- you've got to -- you've got to do it.

9     You can do it.  You can be successful.

10          But do not for a minute forget how serious this

11     was and the consequences that you'll have to carry with you.

12     And make sure that you always are doing what you're supposed

13     to be doing.  Because the next time -- if there is a next

14     time, it will go badly for you.

15          THE DEFENDANT:  Yes, Your Honor.

16          THE COURT:  And so I want to wish you and your

17     family the best.  And I hope you understand how serious this

18     was.  And I hope you thought -- I hope you think about --

19     when you're doing your time, I hope you think about the

20     victims of the crimes.  Think about these children who are

21     victimized by this.

22          And by -- even by downloading this stuff and

23     carrying it around on your computer, you're -- you're

24     helping to allow that to happen.

25          And I want you to think about that and I want you

1    to remember it.  And I want you to go on and live a

2    law-abiding, productive life.  And I'm confident you can do

3    that.  And I wish you well.

4              THE DEFENDANT:  Thank you, Your Honor.

5              THE COURT:  We're in recess.

6              COURT SECURITY OFFICER:  All rise.

7              (The proceedings concluded at 12:40 p.m.)

8                            - - -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>**CERTIFICATE**</u>


UNITED STATES DISTRICT COURT )
                             )
MIDDLE DISTRICT OF FLORIDA   )


       I hereby certify that the foregoing transcript is a true and correct computer-aided transcription of my stenotype notes taken at the time and place indicated herein.


       DATED this 13th day of April 2011.



       s/Shannon M. Bishop
       Shannon M. Bishop, RMR, CRR